CATTARAUGUS COUNTY.—HON. ALFRED SPRING, SURROGATE.—December, 1887.

HITCHCOCK v. WILTSIE.*

*In the matter of the estate of* JAMES WILTSIE, *deceased.*

In a special proceeding instituted by a legatee under Code Civ. Pro., § 2717, to procure payment of her legacy, the executors having filed an account wherein the widow of decedent, executrix, made a personal claim against the estate—it appeared that testator and his wife, the claimant, had for years resided together in the village of A., where the former had carried on the business of note brocage and money lending, including the buying and selling of mortgages and other securities. The claim in question was for $1,000 which the widow contended represented money belonging to her, which decedent had invested in a mortgage given to himself as mortagee. It appeared

* Affirmed at General Term.

that decedent had admitted the absorption of funds belonging to claimant in his own business, and had expressed a desire to protect the rights of his wife, in respect to moneys belonging to her and handled by him; that no demand had ever been made upon him for a settlement; and that within six years he had assigned to the claimant a bond and mortgage to apply upon his obligations to her for moneys received by him as her agent.—*Held,*

1. That, although the mere fact of payment to decedent of moneys of claimant was not conclusive in favor of her demand against the estate, the corroborative evidence was ample to support her claim, and that the same had not been satisfied.

2. That the defence of the statute of limitations was negatived by the circumstance that no demand had been made upon decedent, and that payment or delivery had been made upon account.

AMY HITCHCOCK, a legatee under decedent's will, having filed a petition, under Code Civ. Pro., § 2717, for the payment of her legacy, a citation was issued, at the return whereof all parties interested appeared and the executors filed their account. The widow, who was also executrix, presented a personal claim against the estate of her husband and testator, the facts relating to which are sufficiently set forth in the opinion.

CARY & RUMSEY, *for Malvina Wiltsie.*

CORBIN & JEWELL, *for Amy Hitchcock.*

THE SURROGATE.—The claimant, who was Malvina Huntley by name, married the testator in 1860. About a month prior to the marriage, testator conveyed to her a farm situate in the town of Allegany, in this county; on April 1st, 1867, claimant sold this farm to one Leonard Sprague for $4,400, of which 1,000 were paid in cash to her husband, James Wiltsie, and $3,400 were secured by a purchase-money mortgage, payable to Mrs. Wiltsie.

This sum of $1,000 was invested by Mr. Wiltsie in a real estate mortgage against Nathan A. Dye, bearing date April 4th, 1867, and payable to Wiltsie himself, as mortagee. At the time this was made, Mr. Wiltsie stated that it was in pursuance of an arrangement with his wife, whereby he was to handle her money, and as he was engaged in the business of buying commercial paper and other securities, purchasing them at a discount, he was to have whatever he made in the way of a bonus, and was to assign to her mortgages whenever she demanded it, in payment of the moneys so received belonging to her. Payments were made upon the Sprague mortgage from time to time, but they were invariably paid to Mr. Wiltsie, and by him invested for his benefit, and evidently under the arrangement mentioned.

In 1875, Mrs. Wiltsie received, from Sebastian Weiler and another, a mortgage of $515.50, which, while it is unexplained, is embodied in the account filed by her in this proceeding as a credit upon her claim. In November, 1880, Mr. Wiltsie caused to be assigned to his wife a mortgage for $636 against one Elsie Schoonoven, explicitly stating it was to apply on the account growing out of the payments made to him on the Sprague mortgage. In September, 1877, the Sprague farm was sold by the then owner, and mortgages were given by the purchasers directly to Mrs. Wiltsie, but the payments made by these new mortgagors, as well as those made on the Schoonoven and Weiler mortgages, were uniformly paid to the testator.

In 1872, Mrs. Wiltsie obtained, upon lands in Allegany county, a mortgage against one Henry Huntley,

VOL. VI.—17

for the sum of $1,670.   The proof is silent as to what source the money came from, that was invested in this mortgage, yet the claimant's chief witness, Mr. Willard, and who was familiar with the financial standing of the Wiltsies, testifies that she had no property whatever, except what came from the Sprague farm, so it is a fair presumption that this Huntley mortgage was the outgrowth of this farm sale.   This is an especially irresistible inference, in view of the fact that the claimant was a witness in her own behalf, yet vouchsafed no explanation of this mortgage.

The testator talked quite freely with his proposed executor, Willard, as to this indebtedness to his wife at the time of the giving of the Dye mortgage, as above stated, and casually, from time to time after this, and again two or three years ago, when Mr. Willard was critically sick.   At these talks, Mr. Wiltsie was free to admit the absorption of these payments on the Sprague sale in his own business, and in the last conversation seemed to be anxious that his wife's rights, on account of these payments to him, should be carefully protected.

Counsel for contestant strenuously objects to the allowance of this claim, principally upon two grounds:

*First.* It is urged, with much adroitness, that the fact of the payment to Wiltsie of these several sums on these mortgages is not sufficient to uphold the claimant's account against his estate : that he was simply her cashier, or secretary and that the burden is upon her to show, by unmistakable proof, that this money was not received by her.

Did the claimant's case depend wholly upon the

isolated fact that these moneys were received by her husband, the position of contestant's counsel would be a tenable one.   Such a transaction in and of itself would be no more than a husband, especially a business man, would be likely to do for his wife.   But in this case, there are other circumstances which serve to characterize the transaction.   The $1,000 paid in cash at the time of the sale of the farm, was invested by Wiltsie in a mortgage payable to himself, and that investment was accompanied with the explicit statement, that he was to handle her money in order that he might make the excess above the legal interest, which he seemed confident he could obtain. This temptation to the money shaver was too strong to be resisted.   Again, at the time of the assignment of the Schoonhoven mortgage, and at the times of his other talks with Willard, he admitted his liability to his wife, and his desire and intention to transfer to her securities, and protect her in some other way, on account of his use of these moneys.   The testator and his wife resided in the village of Allegany, and their principal business for many years seems to have been loaning money, buying mortgages and other securities in that vicinity.   In a rural township, a man's business is known to his neighbors, and is the subject of corner-grocery and fireside talk, so that, if Mrs. Wiltsie had been personally taking securities in her own name, other than those presented on this trial, that fact would have been ascertained by the vigilant counsel for the contestant.   If the money paid from time to time had been handed over to her by her husband it

is hardly probable she would have hoarded it in specie; the Wiltsies were too thrifty for that.

These facts are all corroborative of claimant's position, and establish clearly to my mind that these moneys were used by Mr. Wiltsie with the assent of his wife but with the mutual expectation that he was to transfer to her securities in payment therefor whenever she might require it.

*Second.* But it is claimed her demands are barred by the statute of limitations.

1. These moneys were not loaned to Wiltsie. He was the custodian of her funds, her depositary, and was to make over to her mortgages when she demanded it done. He said he would pay this when she demanded—that he would account to her for the principal and interest, and what he could make, over and above that, he should have. Under this definite arrangement, Wiltsie could not have been compelled to account to his wife, or assign mortgages to her in liquidation of her claim until a demand had been made of him therefor, and, *a fortiori,* the statute would not commence to run against her, until he had refused to perform his part of the agreement (Boughton v. Flint, 74 *N. Y.,* 476; Payne v. Gardiner, 29 *N. Y.,* 146; Smiley v. Fry, 100 *N. Y.,* 262; Howell v. Adams, 68 *N. Y.,* 314; Munger v. Albany City Nat. Bk., 85 *N. Y.,* 580, 587).

It is like the rule that has always obtained, as to a deposit with a bank; a demand is necessary before a right of recovery accrues, and hence the statute of limitations does not commence to run until after a refusal to pay has been made by the bailee (Story on

Bailments, § 88; Downs v. The Phoenix Bank, 6 *Hill*, 297; Pardee v. Fish, 60 *N. Y.*, 265; Bank of N. A. v. Merchants Bk., 91 *id.*, 106).

2. But aside from the rule above invoked, the statute of limitations would not be available to the contestant. In 1880, the Schoonhoven mortgage was caused to be transferred to Mrs. Wiltsie by testator, expressly to apply in payment of the moneys he had taken under the arrangement stated. This transfer or delivery of property in payment of this specific indebtedness operated the same as a cash payment and revived the debt or prevented the running of the statute (Smith v. Ryan 66 *N. Y.*, 352; Harper v. Fairley, 53 *N. Y.*, 442; Butts v. Perkins, 41 *Barb.*, 509; Sibley v. Lumbert, 30 *Me.*, 253).

Nor does the fact that the satisfactions of these mortgages were executed by claimant militate in any way against her. Even if the money had been taken by testator, in pursuance of a written contract under seal, to be invested by him for her benefit, it would still require the discharge of each mortgage to be executed by her. The mortgages were payable to her, and the record thereof could only be cleared by a satisfaction made by her. The retention and investment of the money by him was in consequence of an agreement wholly independent of the mortgages, and their satisfaction had not the slightest bearing upon this arrangement between the testator and claimant.

A decree will be entered, establishing the accounts of claimant, computing interest on the several payments made to Mr. Wiltsie at seven per centum until January 1st, 1880, and at six per centum since that

time. The estate must be credited with the Huntley mortgage and the other credits set forth in the account, with interest to be computed upon the same basis as the accounts chargeable to the estate. Formal findings of fact, in accordance herewith, will be filed to accompany the decree, and the costs will then be adjusted.