WOLFF *v.* JASSPON.

SET-OFF—EQUITY—CLAIM OF ONE DEFENDANT.

Complainant contracted to sell land to defendants, who were husband and wife; the husband intending the land as a present to his wife, and paying part of the purchase price and signing her name to the contract without her knowledge. The men also had other dealings in which the husband was indebted to complainant, and at divers times made payments and gave him collaterals and other securities, which complainant disposed of and refused to account for, more than sufficient to pay all debts they were given to secure and the balance on the land contract. In a suit to foreclose the land contract for failure to pay the balance of the purchase price, defendants sought an accounting for such securities, and application of the excess, above the debts secured and paid thereby, as an offset of the amount due under the contract, and judgment for the balance. *Held*, that, under 3 Comp. Laws 1897, § 10075, subd. 6, providing that, if there be several defendants, the demand set off must be due to all of them jointly, the

claim of the husband alone could not be set off at law, and that, in the absence of insolvency of the complainant, or something in the nature of the claim or the situation of the parties showing that justice would not otherwise be done, equity should follow the law, and refuse to allow the claim as an equitable set-off.

Appeal from Alpena; Kelley, J. Submitted October 9, 1900. Decided February 27, 1901.

Bill by Bernard Wolff against Annie Jasspon and Max Jasspon to foreclose a land contract. From a decree for complainant, defendants appeal. Affirmed.

*J. D. Turnbull*, for complainant.

*L. G. Dafoe*, for defendants.

LONG, J. Complainant and defendant Annie Jasspon are brother and sister. Max Jasspon, the other defendant, is the husband of Annie. In 1892, and for some years prior thereto, the defendants rented from complainant the premises involved in this suit. Mr. Jasspon was carrying on a clothing business, and was advanced moneys from time to time by complainant for his business. Previous to February, 1892, it is claimed by defendants, Jasspon concluded to purchase the premises belonging to complainant, intending to make his wife a present thereof, and that, without her knowledge and consent, he negotiated and agreed on the bargain, and on January 27th sent his personal check for $500, and duplicate contracts for the complainant to sign; that Max Jasspon signed Annie's name, as per Max Jasspon; that it was understood by complainant that Annie was only a nominal party, that Max Jasspon was the purchasing party, and that complainant looked to him to settle in the future. We think the testimony tends to show these facts.

The contract is dated February 1, 1892; the purchase price being $2,800, to be paid as follows: $500 at the date of purchase; $500 July 15, 1892; $500 February 1, 1893; $800 July 1, 1893; $500 December 15, 1893,—with interest

at 7 per cent., payable annually. Jasspon paid only the first $500 on the contract. Complainant and he continued to have business with each other, and in 1895 complainant desired that Jasspon secure him for moneys advanced for his business by assigning to complainant certain promissory notes secured by real estate and chattel mortgages, amounting to $8,600, which was done. Jasspon also deeded to complainant a farm known as the "Anderson Farm," valued at $900, and lands in Montmorency county valued at $3,000. In April, 1896, Jasspon gave complainant notes in the amount of $8,000, and in September following turned over to him negotiable notes of other parties amounting to $3,525.84; and at that time complainant surrendered to Jasspon his (Jasspon's) notes amounting to $3,696.40, which left due complainant from Jasspon $4,117, and for which he held three negotiable notes, dated April 26, 1896,—two for $1,000 each and one for $2,117. It is claimed that, in the settlement made in which the $4,117 balance was struck, the securities turned over to complainant in 1895 were not considered at all, and did not go into the settlement. In October, 1896, Jasspon secured complainant for the $4,117 by giving a trust mortgage. It is claimed that, soon after, the complainant and George L. Maltz took charge of the trust property and converted the same into cash, and that, if the moneys had been applied by complainant and Maltz as trustees according to the terms of the trust, all indebtedness would have been paid.

It is claimed by defendants, further, that a few days after giving the trust mortgage to complainant and Maltz, securing the $4,117, complainant came to Alpena, and Jasspon asked him to turn over the securities, and complainant said he would fix it up. It is further claimed that he urged complainant from time to time to turn back to him the securities he then held, and that in 1898 he told complainant that he would surrender the house contract and pay rent on the premises if complainant would give up the securities, or that he would pay him $1,500 in

cash if he would give them up and give a deed for the house, and that complainant would do neither; that in 1898 he had a chance to sell the Anderson farm for $900, but that complainant would not deed back the farm to him, nor would he give up the securities; that in May, 1898, he wrote complainant a letter notifying him that, if he did not give up the securities and reassign the same, he would hold him responsible for the full amount of them, and that complainant did not answer this letter; that on June 9th he wrote him a similar letter, which was never answered; that in June, 1898, complainant having given defendants notice to quit the premises, they gave the complainant the following notice:

"We have been served with notice pertaining to the house, etc., purchased from you under land contract. We desire to notify you that you have been paid in full for all dues on said contract, by keeping property turned over to you as security, which you refuse to give up; and we hereby demand payment for the differences of the amount that was due on land contract before you converted and refused to give up securities turned over to you, and the values of the securities in excess of said contract, to wit, $3,000."

It is claimed that although complainant admits that the funds received from the sale of the mortgaged property, if properly applied, would pay all Jasspon's indebtedness to him, except the house and lot indebtedness, he refused, after repeated demands, to deliver up the same, but converted them to his own use, and that in this proceeding, which is a bill filed to foreclose the land contract, the defendants have the right to have the value of these securities so converted by complainant set off against the contract price, and that they are entitled to a decree in their favor for the balance. The testimony of defendants tends to support these claims.

It is claimed by complainant that there was about $1,700 not included in the trust mortgage; that there was due him on the indebtedness from Jasspon, exclusive of that due under the land contract, the sum of $1,400. On the

other hand, it is claimed by defendants that the complainant had been paid in full for all indebtedness due him, leaving securities in his hands amounting to over $8,000.

The court below was of the opinion that the value of these securities which the complainant refused to turn over to Jasspon could not be set off by Jasspon and his wife against the amount due on the land contract, and entered a decree in the case finding that there was due upon the contract from the defendants to complainant the sum of $3,725.10, and decreed a sale of the premises to meet the amount due.   We think the court below was not in error in this ruling.   It is claimed by counsel for defendants that the court should have allowed the set-off, and have determined the difference in the amounts in their favor, and rendered a decree for them for such difference, on the ground that if there are special equities, growing out of the transaction itself, requiring it, courts of equity will allow set-off in cases where the law will not.   Under our statute (subdivision 6, § 10075, 3 Comp. Laws 1897), set-offs are only allowed, where there are several defendants, when the demand to be set off is due to them all jointly, except where other provision is expressly made by law.   Here the demand is owned by Max Jasspon individually, and is not a joint demand by both himself and wife. As a general principle, courts of equity follow the rules of law in enforcing set-offs.   There are no special equities growing out of the transaction requiring set-off in the present case.   The general rule is that equity requires cross demands to be set off against each other, if, from the nature of the claim or the situation of the parties, justice cannot otherwise be done, as where the plaintiff is insolvent, thus rendering it apparent that defendant cannot obtain satisfaction unless set-off be allowed.   In *Munger* v. *Bank*, 85 N. Y. 580, 588, it was said:

"Equity sometimes allows a set-off when law will not, because of the insolvency of one debtor, and the willingness of the other to anticipate the time for the payment of the debt owing by him, if the whole or a part of that owing to him may be applied as a set-off."

Other instances might be cited where equitable set-offs are allowed. However, none of the reasons exists in the present case. The complainant here is not shown to be insolvent, and, as the right of set-off does not exist at law, equity must follow the law.

The decree below must be affirmed, with costs to complainant.

The other Justices concurred.